

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

MPR:PP/MWG
F. #2018R02382

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 3, 2020

<u>By Hand and ECF</u>

The Honorable Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Alonzo Shipp
      <u>Criminal Docket No. 19-29 (NGG)</u>

Dear Judge Garaufis:

   The government respectfully submits these motions <u>in limine</u> in advance of the March 30, 2020 trial in the above-referenced case.  The defendant is charged with one count of being a felon in possession of a firearm and one count of being a felon in possession of ammunition, both in violation of 18 U.S.C. § 922(g).  The charges stem from the defendant's attempted murder of a victim, John Doe (hereinafter the "victim"), in the early morning hours of July 20, 2018 in Queens, New York.  As set forth below, the government seeks to admit i) a 911 call made by the victim during the incident and ii) a statement made by the victim to a police officer immediately after the incident.

I.  <u>Factual Background</u>

   On July 20, 2018, at approximately 2:51 a.m., the defendant shot the victim in the abdomen outside 117-26 147th Street in Queens, New York.  The victim fled and then collapsed approximately one and a half blocks away from the shooting, on the corner of 119th Avenue and Sutphin Boulevard.  Video surveillance shows that the defendant followed the victim.

   Immediately after he was shot, the victim called 911 (the "911 call").[1]  The victim stated, "I've been shot," and reported his location.  The victim then exclaimed:  "My

---

   [1] A CD containing the audio file of the 911 call (previously produced to the defendant on February 18, 2019, bates-numbered ASHIPP000098), as well as a draft transcript of the call (marked as Exhibit 1 and 1-T respectively) will be delivered to the Court

shooter's chasing me right now. . . .  My shooter is coming right now . . .  My shooter is on me right now. . . .  My shooter is right here.  My shooter is right here."  Ex. 1.  The 911 call then captured the victim begging the shooter not to kill him in real time.  The victim pleaded: "I don't want to die Pump, please, please.  I don't want to die Pump.  Please.  I don't want to die Pump.  Pump.  Pump.  Pump.  I don't want to die Pump.  Pump I don't want to die Pump."  The evidence at trial—including a tattoo on the defendant's arm that says "Pump," the defendant's Facebook messages, the defendant's emails from the Metropolitan Detention Center, and surveillance video from this incident—will demonstrate that the defendant goes by the nickname "Pump."

As the 911 call captured the victim begging for his life, video surveillance shows that the defendant stood over the victim with the firearm but did not fire again.  (The firearm was later recovered, and analysis of the firearm revealed that it had jammed.)  The defendant then walked north on Sutphin Boulevard and left the firearm in a dumpster two blocks away on Sutphin Boulevard near Foch Boulevard.  After the defendant walked away, the victim again reported his location and said: "I've been shot in the stomach.  I'm dying."  Law enforcement responded to the victim less than a minute after the defendant left the scene.  Immediately after the shooting, the victim told the NYPD officer that first responded to the scene that his friend "Pump" shot him and that he knew "Pump" for over twenty years.

Several hours later, at approximately 8:00 a.m., an employee of the business located on the corner of Sutphin Boulevard and Foch Boulevard (where the defendant briefly stopped) discovered a firearm in a dumpster, which the employee had left on the sidewalk the previous night for garbage pickup and which was otherwise empty except for the firearm.  The NYPD also located a spent shell casing outside 117-26 147th Street where the victim had been shot.  Ballistics analysis determined that the recovered shell casing was fired from the firearm found in the dumpster.

II.   Legal Standard

A.   Present Sense Impressions

Rule 803(1) of the Federal Rules of Evidence provides an exception to the general rule against hearsay for any statement "describing or explaining an event or condition, made while or immediately after the declarant perceived it."  Fed. R. Evid. 803(1).  "By its own terms, application of Rule 803(1) has three distinct requirements: i) the statement must describe or explain the event perceived; ii) the declarant must have in fact perceived the event described; and iii) the description must be 'substantially contemporaneous' with the event in question."  United States v. Mejia-Valez, 855 F. Supp. 607, 613 (E.D.N.Y. 1994) (internal citations omitted).  Because "in many, if not most, instances precise contemporaneity is not possible, . . . a slight lapse is allowable between the

---

by hand.  The government seeks to admit only the portions of the call that are reflected in the attached transcript and does not seek to admit the call in its entirety.

event perceived and the declarant's statement." Id. (internal citation and quotation marks omitted omitted). "[T]here is no per se rule indicating what time interval is too long." Id. (citation and internal quotation marks omitted).

The reason for this exception is twofold. First, the immediacy requirement reduces the opportunity for reflection, and thus minimizes the likelihood of deception or fabrication on the part of the declarant. Second, immediacy also reduces the likelihood that the declarant will have inaccurately remembered the event in question. See United States v. Jones, 299 F.3d 103, 112 (2d Cir. 2002) ("Such statements are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory.").

B.   Excited Utterances

An excited utterance is a statement "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). To qualify as an excited utterance, the proponent of an out-of-court statement must establish the following: i) that a startling event occurred; ii) that the declarant made the statement while under the stress of the excitement caused by the startling event; and iii) that the declarant's statement relates to the startling event. See United States v. Brown, 254 F.3d 454, 458 (2d Cir. 2001).

"The rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability. An excited utterance need not be contemporaneous with the startling event to be admissible under Rule 803(2)." United States v. Tocco, 135 F.3d 116, 127 (2d Cir. 1998).

III.   Discussion

A.   The Court Should Admit the 911 Call

The 911 call is a quintessential present sense impression of a declarant explaining an event that had just transpired (and was continuing to transpire during the call) in his immediate presence. The victim called 911 at 2:52 a.m. almost immediately after the defendant shot him. During the call, the victim says that he has been shot and then yells to the operator that his shooter is coming towards him. The victim then stops speaking to the operator and begs "Pump" for his life. The victim's statements are a clear indication of the immediacy and ongoing nature of the event. The victim sounds frightened and upset, but his statements are straightforward and clear, and there is no indicia that his statements were calculated for an ulterior purpose. See Jones, 299 F.3d at 112 ("Such statements are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory."). Because the victim was describing events he perceived as they occurred and in their immediate aftermath, the 911 call should be admitted as a present sense impression.

The 911 call is also admissible as an excited utterance.  First, a startling event had occurred and was continuing to occur—the defendant shot the victim, the victim fled, and then, as the victim lay on the ground, the defendant walked towards the victim and stood over him.  As the 911 call captures, the victim was undoubtedly terrified.  The 911 call also leaves no doubt that the victim was referring to the shooting that had just occurred and the events that were continuing to occur during the call.  He provided his location and yelled that his "shooter" was coming towards him.  Then the victim begged for his life as the defendant stood over him.  The evidence will show that the call is consistent with surveillance video of the incident.  Thus, the reliability of his information cannot seriously be questioned.

For the foregoing reasons, courts have routinely admitted similar 911 calls as both present sense impressions and excited utterances.  See United States v. Steele, 216 F. Supp. 3d 317, 322 (S.D.N.Y. 2016) (911 call made by individual who observed argument and heard gunshot admissible under either exception); United States v. Lloyd, 859 F. Supp. 2d 387, 395 (E.D.N.Y. 2012) (holding 911 call admissible under both exceptions—"a present sense impression in that it described or explained the robbery immediately after the event by one who personally observed the event," and "an excited utterance in that it was made by a participant while under the stress of the obvious excitement caused by the robbery by men with guns"); see also United States v. Shoup, 476 F.3d 38, 42 (1st Cir. 2007) (admitting 911 call made one or two minutes following event); United States v. Hawkins, 59 F.3d 723, 730 (8th Cir. 1995) (911 call made within seven minutes of the event sufficiently contemporaneous to be a present sense impression), vacated on other grounds, 516 U.S. 1168 (1996).  The 911 call in this case is no different.  As discussed above and as can be heard from the audio of the call, the victim called 911 immediately after he had been shot, he reported his location and then yelled that his shooter was coming towards him.  Then, he stopping talking to the 911 operator to beg for his life.  Accordingly, the Court should grant the government's motion to admit the 911 call.

B.    The Court Should Admit the Victim's Statement to the
       Responding Police Officer Immediately After the Incident

The Court should also admit the victim's statement to the responding police officer immediately after the incident that "Pump" shot him as a present sense impression or excited utterance.  This statement occurred within minutes of the defendant shooting the victim and the victim begging for his life.  The victim made the statement after suffering a serious gunshot wound to his abdomen.  A statement by a victim of a shooting in the immediate aftermath of the shooting and begging for his life from the shooter meets the requirements of both hearsay exceptions.

United States v. Delvi, 275 F. Supp. 2d 412 (S.D.N.Y. 2003), is instructive.  In Delvi, the government sought to call an NYPD officer to testify regarding a shooting victim's statement that he made forty minutes after the shooting while he was already in the hospital.  The Court held that the statement was admissible as an excited utterance, noting that "[i]t is hard to believe that [the victim] could not have been excited less than an hour after having experienced a startling event of the highest order."  Id. at 415; see also United

States v. Scarpa, 913 F.2d 993, 1017 (2d Cir. 1990) (victim's statement to the police hours after severe beating was excited utterance when perpetrator had come to the hospital and victim thought "they were going to finish the job").  Because the victim made the statement within minutes of witnessing "Pump" shooting him, and the victim was still experiencing the stress of the shooting and begging for his life, the statement to the police officer regarding the identity of his shooter is admissible as both a present sense impression and an excited utterance.

C.    Admission of these Statements Does Not Violate the Confrontation Clause

Finally, the admission of the 911 call and the statement to the responding officer do not offend the Confrontation Clause of the Sixth Amendment.  The Confrontation Clause prohibits the government from introducing "testimonial" statements by a non-testifying declarant unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant.  See Crawford v. Washington, 541 U.S. 36, 68-69 (2004).  A statement is "testimonial," such that it "triggers the protections of the Confrontation Clause," only "when it is made with the primary purpose of creating a record for use at a later criminal trial."  United States v. James, 712 F.3d 79, 96 (2d Cir. 2013).  The admission of "nontestimonial" statements does not violate the Confrontation Clause.  See, e.g., United States v. Feliz, 467 F.3d 227, 231 (2d Cir. 2006) (holding that "the Confrontation Clause simply has no application to nontestimonial statements").

In Davis v. Washington, 547 U.S. 813 (2006), the Supreme Court held that admission of a declarant's statements to a 911 operator did not violate the Confrontation Clause because "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency."  Id. at 823; see also id. at 827 ("A 911 call, . . . and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance."); United States v. Cadieux, 500 F.3d 37, 41-42 (1st Cir. 2007) (holding that "statements recorded during the 911 call are nontestimonial hearsay"); United States v. Thomas, 453 F.3d 838, 843-44 (7th Cir. 2006) (holding that anonymous caller's statements to 911 operator that "'[t]here's a dude that just got shot . . . ,' and that 'the guy who shot him is still out there'" were nontestimonial).  Nothing about the 911 call here provides a reason to depart from this precedent; the call was a typical 911 interaction intended to summons an ambulance and police for assistance.

The victim's statement to the NYPD officer that "Pump" shot him also does not implicate the Confrontation Clause, because it was made in the immediate aftermath of the shooting when the police were actively searching for the perpetrator.  The Supreme Court's decision in Michigan v. Bryant, 562 U.S. 344 (2011), is directly on point.  In Bryant, police officers responded to a radio dispatch that a man had been shot, and they found the victim severely wounded.  In response to police questioning, the victim reported details of the incident and included that, approximately 25 minutes before the police had arrived,

5

"Rick" shot him.  The victim later died.  The Supreme Court held that the admission of these statements to the police did not violate the Confrontation Clause, because the primary purpose of the police interrogation was to respond to the "ongoing emergency" of "an armed shooter, whose motive for and location after the shooting were unknown . . . ."  <u>Id.</u> at 374; <u>see</u> <u>also</u> <u>id.</u> at 376 (responding officers asking "what had happened, who had shot him, and where the shooting had occurred were the exact type of questions necessary to allow police to assess the situation, the threat to their own safety, and possible danger to the potential victim and to the public") (citations and internal quotation marks omitted).  In particular, the Court noted the ongoing danger of a firearm and observed that "[a]n emergency does not last only for the time between when the assailant pulls the trigger and the bullet hits the victim."  <u>Id.</u> at 373.

Here, the victim's statement to the police that "Pump" had shot him falls squarely within the category of nontestimonial statements made during an ongoing emergency.  Minutes after the defendant shot the victim, the victim had identified "Pump" as his shooter to the police.  These circumstances demonstrate that the primary purpose of the statement was not to create a record for later use at a criminal trial, but to find the shooter and address the ongoing emergency of an active shooter in the vicinity.  <u>See</u> <u>United States v. Hayden</u>, 612 F. App'x 381, 384 (7th Cir. 2015) (statements by robbery victim to police officers immediately after it occurred, in which victim identified where the robbers had fled, were nontestimonial "because their primary purpose was to provide police officers with basic information to address an ongoing emergency"); <u>United States v. Clemmons</u>, 461 F.3d 1057, 1060-61 (8th Cir. 2006) (statement by gunshot victim to police regarding who had shot him nontestimonial because "[a]ny reasonable observer would understand that [the victim] was facing an ongoing emergency and that the purpose of the interrogation [including questions on victim's health and who shot him] was to enable police assistance to meet that emergency").  Accordingly, the statement is not testimonial and does not implicate the Confrontation Clause.

IV.     <u>Conclusion</u>

      For the reasons discussed above, the government respectfully requests that the Court grant its motions <u>in limine</u>.

           Respectfully submitted,

           RICHARD P. DONOGHUE
           United States Attorney

By:    <u>/s/ Philip Pilmar</u>
        Philip Pilmar
        Michael W. Gibaldi
        Assistant U.S. Attorney
        (718) 254-6106/6067

cc:    Ashley Burrell, Esq. (By ECF and Hand)
       Clerk of the Court (NGG) (By ECF)