**Federal Defenders**
OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David Patton
*Executive Director and
Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

<u>Via ECF</u>  February 21, 2020

The Honorable Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *United States v. Alonzo Shipp,* 19-CR-0029 (NGG)

Dear Judge Garaufis,

      We write in reply to the government's response to the defense motions *in limine* (ECF 55) and to the government's cross-motion *in limine* (ECF 53).

I. **The 911 Call And Statement To Law Enforcement By The Complainant Should Be Excluded.**

    A. <u>**The Complainant's Out-of-Court Statements Regarding The Identity Of The Shooter Lack Sufficient Indicia of Trustworthiness and Reliability To Be Introduced Without Being Tested By Cross-Examination.**</u>

      In both its response to the defense request to exclude the complainant's out-of-court statements regarding the identity of the shooter and its affirmative motion to introduce these same statements, the government fails to address how, despite concerns relating to the complainant's physical and mental condition and motive to fabricate, the 911 call and statement to law enforcement are sufficiently reliable to be admitted without being subject to cross-examination. The statements are not present sense impressions or excited utterances because they lack sufficient indicia of trustworthiness and reliability to qualify under either exception to the hearsay rule.

      The government incorrectly suggests that issues relating to the reliability and trustworthiness of an out-of-court statement go solely to the weight of the evidence, and not its admissibility. *See* Govt Resp., ECF 55 at 2. An out-of-court statement is inadmissible under any exception to the hearsay rule if it is unreliable. *See United States v. Carneglia*, 256 F.R.D. 384, 392 (E.D.N.Y. 2009) ("[T]he rules on hearsay should be read to exclude unreliable hearsay but to admit reliable hearsay."). When assessing whether a statement qualifies even under a well-

1

established hearsay exception, courts consider factors relating to reliability, including the declarant's motive to lie and the declarant's physical and mental condition. *See United States v. Delvi*, 275 F. Supp. 2d 412, 415 (S.D.N.Y. 2003). Here, an examination of these three factors show that the statements the government seeks to admit do not qualify under any exception to the hearsay rule.

The complainant admitted to law enforcement that he had been drinking all day prior to the shooting. The government concedes this, but does not address how the complainant's level of intoxication may have compromised his ability to accurately perceive who, among the group of men that were present, had shot him. Instead, the government contends, without citation to any evidence, that drinking all day does not necessarily mean the complainant was too intoxicated to identify who shot him. *See* Govt Resp., ECF 55 at 2, fn. 2.

In its affirmative motion *in limine* to admit the same statements that the defense moved to exclude, the government argues that the complainant's statements "cannot be seriously contested" because he was "undoubtedly terrified." Govt MIL, ECF 53 at 4. Fear does not increase accuracy. As the court in *Winzer v. Hall*, 494 F.3d 1192, 1200 (9th Cir. 2007) explained: "Just because a subject is or appears to be *upset* offers no guarantee that he has not taken time to consider the matter. The subject may be upset precisely because he's had time to reflect, or he may feign emotional distress in a calculated effort to appear more credible."

The government also suggests that extreme pain should not be considered when evaluating whether a statement qualifies under an exception to the hearsay rule. Case law says otherwise. In *United States v. Jordan*, No. CRIM. 04-CR-229-B, 2005 WL 513501 (D. Colo. Mar. 3, 2005), the court determined that the declarant's statement was inadmissible because it was testimonial *and,* relatedly, because the reliability of the statement was unclear. The court expressed the following regarding reliability: "A dying declaration may not be reliable because perception, memory, comprehension, and clarity of expression are likely to be impaired in a dying person. The experience of pain could affect the trustworthiness or accuracy of the declaration." *Id.* at 4 (internal citations omitted). The court then analyzed whether the same statements were admissible under the excited utterance hearsay exception. For the same reasons, the court said no. *Id.*

Finally, the complainant gave inconsistent responses when asked whether he could identify who shot him. The complainant's inconsistent answers suggest either a motive to fabricate, or an uncertainty as to who the actual shooter was. Either reason points strongly toward a need for the complainant's reliability to be tested at trial. Moreover, the complainant's assertion to law enforcement that he would "handle the situation himself" (Govt Resp., ECF 55 at 3, fn. 4) is worrisome and further suggests a motive to lie. The government does not provide any evidence to refute the reliability concerns raised regarding the call and subsequent statement to law enforcement.

The 911 call and subsequent statement to law enforcement should not be admitted at trial because they raise serious concerns relating to trustworthiness and reliability. This is exactly what the hearsay rule seeks to prevent. *See Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 232 (2d Cir. 1999) ("The hearsay rule is generally said to exclude out-of-court statements officered for

the truth of the matter asserted because there are four classes of risk peculiar to
this kind of evidence: those of (1) insincerity, (2) faulty perception, (3) faulty memory[,] and
(4) faulty narration, each of which decreases the reliability of the inference from
the statement made to the conclusion for which it is offered." ). The government—who bears the
burden of showing sufficient reliability—has failed to demonstrate that, despite the declarant's
physical and mental condition and motives to lie regarding the identity of the shooter, the
statements qualify under an exception to the hearsay rule. The 911 call and subsequent statement
should be precluded at trial based on their unreliability.

If the government wishes to present an identification of the shooter, it should bring the
complainant to court to be subject to cross-examination.

### B. The Complainant's Statement to Law Enforcement At The Scene Was Testimonial.

The complainant's statement to the responding officer that "Pump" shot him must also be precluded for a second reason: because it is testimonial.[1]

First, the government does not indicate what the complainant made this statement in response to. Presumably, however, it was in response to an investigatory question by law enforcement regarding who shot him. When determining whether a statement is testimonial or non-testimonial, the interrogator's questions, as well as the declarant's statements, must be considered. *See Michigan v. Bryant*, 562 U.S. 344, 367–68 (2011) ("In many instances, the primary purpose of the interrogation will be most accurately ascertained by looking to the contents of both the questions and the answers.").

Additionally, the complainant made this statement *after* law enforcement arrived at the complainant's location, observed his medical condition, and when the assailant was no longer present; thus there was no continuing danger. The timing of the complainant's statement and the investigatory nature of the statement indicate that it is testimonial and therefore inadmissible under the Confrontation Clause.

### C. The 911 Call Is Unfairly Prejudicial And Should Be Excluded Under Rule 403.

The government argues that the 911 call is highly probative, but fails to refute the strong specter of unfair prejudice raised by it: emotionally-charged statements from a man who believes he is about to die evoke emotions in the listener that will create a substantial risk of a verdict based on emotion, rather than evidence. Portions of the 911 call concern conduct more sensational and disturbing than the actual crime charged. The tenor and tone of the 911 call is unfairly prejudicial and outweighs any probative value as to the actual charges in this case of possession of a specific firearm and ammunition.

The following statements on the 911 call are particularly problematic and offer limited probative evidence as to any element of the charged offenses:

---

[1] Mr. Shipp relies on the arguments made in his original *motion in limine* concerning the testimonial nature of certain statements the complainant made to the 911 operator. *See* Def. MIL, ECF 52 at 7-9.

3

- **Pump. Pump. Pump. I don't want to die Pump. I don't know to die**. (Govt MIL, ECF 53, Exhibit 1-T at 3, line 18).
- **Die Pump. Pump** (*Id.* at 3, line 23).
- **I'm dying. I'm dying** (*Id.* at 4, lines 5-6).
- **I'm dying ma'am** (*Id.* at 4, line 10).

Mr. Shipp is not charged with assault or attempted murder. Assuming, *arguendo,* that the statements have some probative value to the charged offenses, the risk of unfair prejudice is still too great. "When material evidence has an additional prejudicial effect …the prejudice must be unfair in the sense that it could unduly inflame the passion of the jury, confuse the issues before the jury, or inappropriately lead the jury to convict on the basis of conduct not at issue in the trial. *United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir. 2006). The statements listed above depict a man conveying to a 911 operator that he believes he is going to die. The statements will "unduly inflame" sympathy and may lead jurors to be swayed by emotion. The risk of unfair prejudice is too great to permit the 911 call to be played at trial.

If the Court finds that the 911 call is admissible despite the defense's objections to the declarant's reliability and the testimonial nature of some of the statements, the defense requests that a transcript of the call, and not an audio recording, be admitted. A transcript mitigates some of the risk of unfair prejudice based on the tone and tenor of the call. Additionally, it reduces the risk of provoking an emotional response in jurors that would result in a verdict based on an improper basis.

## II.     The Motion To Exclude The Photo Array Is Now Moot.

The government has confirmed that unless the complainant testifies, it will not seek to introduce evidence indicating that the complainant identified Mr. Shipp in a photo array. *See* Govt Resp., ECF 55 at 5. Consequently, Mr. Shipp's motion to preclude hearsay evidence relating to the photo array identification is moot.

## III.    *Giglio* Material Should Be Turned Over No Later Than 30 Days Prior To Trial, If The Court Permits The Government To Offer The Complainant's Statements.

The government acknowledges the importance of providing *Giglio* material in a timely matter to allow the trial to proceed as scheduled. *See* Govt Resp., ECF 55 at 5. It, however, asks the Court and defense counsel to trust that it will do so at a time it deems sufficient, without providing any information whatsoever regarding the nature or extent of that *Giglio* material.

This case differs from the ordinary felon in possession case, because the government is seeking to prove that Mr. Shipp possessed a gun based largely on the unsworn out-of-court statements of an unnamed complainant. There is no surveillance video showing Mr. Shipp possessing a gun; there are no fingerprints; there is no DNA; and no witness will come into court and testify that he saw Mr. Shipp with a gun. If the government is permitted to introduce the complainant's out-of-court statements identifying "Pump" as the shooter, the defense must be able to meaningfully challenge the reliability of that identification before the jury in order to

uphold Mr. Shipp's Sixth Amendment rights.  The defense can only do so if it has adequate time to investigate the complainant (whose identity has not been disclosed by the government) and any *Giglio* material, and to fully litigate before this Court what impeachment of the hearsay declarant will be permitted under Rule 806.  *See* Fed. R. Evid. 806 ("When a hearsay statement ... has been admitted in evidence, the credibility of the declarant may be attacked ... by any evidence which would be admissible for those purposes if declarant had testified as a witness."). In *United States v. Uvino*, 590 F. Supp. 2d 372, 376 (E.D.N.Y. 2008), the court permitted evidence "of prior dishonest acts of the [nontestifying] declarants, including participation in an armed robbery and fabrication of a story to explain the robbery," and evidence that one nontestifying declarant "had faked a seizure," "so that the jury [could] weigh it in considering whether the exclamations of the alleged victims heard on [a] tape were in part or [in] whole a fabrication." *Id.* at 374-75.  *See also Delvi*, 275 F. Supp. at 417 (permitting defense to offer under Rule 806 the declarant's "(1) conviction upon a plea of guilty to criminal possession of a weapon; (2) snorting of heroin after he was shot but before he made the statement to [the] Detective; and (3) inability to identify [the defendant].").  Given the significance of the hearsay declarant's statements here, if the Court rules that the 911 call and statement to law enforcement may be offered at trial, the defense asks that the Court ensure it receive the *Giglio* material pertaining to the declarant at least 30 days prior to trial.  A protective order can be put in place, if appropriate.

With respect to any *Giglio* material pertaining to the law enforcement officers whom the government will call as witnesses, while their credibility is likely to be less at issue than the complainant's, the defense nonetheless seeks to ensure it has adequate time to investigate any CCRB, IAB, or other disciplinary proceedings, and file any appropriate motions pertaining to such *Giglio* material prior to trial.

**IV.     The Court Should Exclude The Unfairly Prejudicial Facebook Messages.**

While the parties' dispute over the Facebook messages has narrowed significantly since the filing of the defense motion *in limine* (*see* Govt Resp., ECF 55 at 5–7), the government continues to seek the admission of several Facebook messages whose probative value is low—particularly in light of other evidence the government will present—and whose risk of unfair prejudice is high.  In order to ensure that Mr. Shipp's jury renders a verdict based solely on the evidence pertaining to the charged conduct and not based on speculation or fear, these Facebook messages should be excluded pursuant to Rule 403.

**A.     The July 26, 2018 postings**

Six days after the shooting, Mr. Shipp messaged "Tasha TheQueen" asking for money and explaining that he needed the money because he was on the run following a shooting at "119 stuphin."  The defense has not challenged the admissibility of these messages that bear on Mr. Shipp's knowledge of and response to the shooting.  However, two specific messages in the exchange between Mr. Shipp and Tasha TheQueen are different in kind from the others: **"I know u seen the news a shooting/ a temp"** and "**No where either a nigga smoke me or I smoke a nigga not going no where**."  These messages do not contain additional information

5

about Mr. Shipp's knowledge of the shooting itself, and, instead, contain information that is not just prejudicial, but unfairly so.

First, the jury should not learn that the shooting was on the news. (**"I know u seen the news a shooting/ a temp."**). Mr. Shipp is not charged with the shooting. This uncharged act will already loom large at trial, and render a fair proceeding on the actual charges—possession of a particular firearm and particular shell cartridge—difficult. That Mr. Shipp knew the shooting was *on the news* is, broadly speaking, relevant to the government's case but has limited probative value as to the elements of the charged offenses, particularly given that the government will introduce other messages in which Mr. Shipp states clearly that he is on the run because of the shooting, notes "they have my pics" and subsequently sends someone the NYPD's wanted poster with his photo and name in connection with the shooting. *See Old Chief v. United States*, 519 U.S. 172, 184 (1997) (the "Rule 403 'probative value' of an item of evidence . . . may be calculated by comparing evidentiary alternatives."). There will be no doubt that Mr. Shipp knew the police suspected him of involvement in the shooting and left the area to avoid the police. On the other hand, the fact of the shooting having been on the news will give the shooting—which, again, Mr. Shipp is not charged with— greater importance and danger in the jury's mind than it would otherwise have, as well as significantly raising the risk of jurors doing independent research to see what was said in the news about the shooting. Accordingly, the defense asks that the reference to the shooting having been on the news be excluded at trial as risking unfair prejudice that outweighs any probative value, particularly in light of the evidentiary alternatives.

Second, the defense asks the Court to exclude from this exchange with Tasha TheQueen the message: "**No where either a nigga smoke me or I smoke a nigga not going no where.**"

```
Author  Tasha TheQueen (100010086900016)
Sent    2018-07-26 04:37:33 UTC
Body    Ok

Author  Sts Pistol Tony (100002075016114)
Sent    2018-07-26 04:37:18 UTC
Body    No where either a nigga smoke 🔫 me or I smoke a nigga not going
        no where

Author  Tasha TheQueen (100010086900016)
Sent    2018-07-26 04:35:08 UTC
Body    Where ya going
```

The government argues that this is an "admission" by Mr. Shipp and thus "patently relevant." *See* Govt Resp., ECF 55 at 6. The question under Rule 403 is not, however, relevance, but whether relevant evidence should be excluded because of "unfair prejudice." Although the government does not articulate to what it believes Mr. Shipp is admitting, the argument appears to be one of propensity: that because Mr. Shipp says on Facebook to Tasha TheQueen that either someone will "smoke" him or he will "smoke" them, indicates, the government seems to assume, that six days earlier he must have shot someone. This is a highly problematic assumption to put before the jury. First, the term "smoke" does not clearly refer to shooting. Rather, it is used as slang for a range of actions: disciplining someone else,

or confronting them, or performing fellatio on them, or, more generally, defeating them.[2] Further calling into question the government's interpretation is that the language of this posting appears to be a reference to the lyrics of a popular rap song "Smoke a nigga" by Juicy J., which is all about smoking marijuana and having sex.[3]  Second, the most obvious interpretation of this message is not the literal "I will shoot him or he will shoot me" but the metaphorical "in this world its kill or be killed" sentiment often used to describe being in a difficult dog-eat-dog situation.  Moreover, his Facebook messages show that Mr. Shipp in fact subsequently leaves for Virginia, without any shooting by or at him, making clear that this message is either posturing on his part, or never meant what the government assumes.  Finally, even if the message could be read to refer to a future shooting, some amorphous future possibility of Mr. Shipp shooting someone cannot be used to prove a prior possession of a different firearm or ammunition other than through a chain of reasoning that would violate Rule 404(b).

The danger of prejudice from this posting is the other side of the same coin:  the specter of Mr. Shipp "smoking" someone could provoke both a visceral reaction and

---

[2] The government makes a blanket assertion in its response that "smoke" means "shoot" (Govt Resp., ECF 55 at 6), but *Urban Dictionary* and the *Online Slang Dictionary* indicate it carries other meanings.  *Urban Dictionary's* primary definition of "smoked" is "To be disciplined through extreme physical exercise or activity"; "to be shot" is a secondary definition.  *See* https:\\urbandictionary.com /define.php?term=smoked.  The *Online Slang Dictionary* defines the verb "smoke" as "to perform fellatio" (giving the examples "I smoked him" and "She doesn't smoke"); "to kill"; "to administer disciplinary punishment through physical exercise"; or "to defeat." https:\\onlineslangdictionary.com/search/smoke.  *Urban Dictionary* defines "smoke" as "Beef, Trouble, Confrontation, Gun Battle".  *See* https:\\urbandictionary.com /define.php?term=smoke.

[3] Yo, too damn high
This OG Kush, what I'm smokin' nigga
Put the fire to a hater, and smoke a nigga
I pull them whips out, and I'm smokin' nigga
You think you high as me, hold on, you must be smokin' nigga
This OG Kush, what I'm smokin' nigga
Put the fire to a hater, and smoke a nigga
I pull them whips out, and I'm smokin' nigga
You think you high as me, hold on, you must be smokin' nigga
Cali weed in a dutch, purple lean in my cup
Smokin' while I'm drivin', nigga we be fucked up
Hit the weed then pass out, homie you an amateur
This bitch is bad as fuck so I'mma grab that camera bruh
Peelin' bank rolls, Condo full of bad bitches
Lot of pills, lot of weed, and a lot of liquor
Sprinkle hash on a blunt bitch Im rich and double cup
Ain't no time bein' wasted…

*Smoke a Nigga* by Juicy J.

speculation in the jurors.  In addition, the use of the term "nigga" is likely to be offensive to some jurors.  This statement runs afoul of Rule 403 by risking that jurors will be lured into declaring guilt based on an instinctive reaction that anyone who threatens to "smoke a nigga" is a bad person who probably possessed a gun.  *See Old Chief*, 519 U.S. at 173 ("unfair prejudice' speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on an improper basis rather than on proof specific to the offense charged.  Such improper grounds certainly include generalizing from a past bad act that a defendant is by propensity the probable perpetrator of the current crime.").

### B. The November 12, 2018 postings

The other set of still-disputed postings is from November 12, 2018, between Mr. Shipp and "Cutemloose Fam."  Again, the defense has stated it will not challenge the admissibility of the wanted poster Mr. Shipp sent to Cutemloose Fam or their subsequent discussion of the police wanting to question Mr. Shipp.  The government seeks, in addition, to offer the following posts:

```
Author  Sts Pistol Tony (100002075016114)
  Sent  2018-11-12 01:18:15 UTC
  Body  Im hurt to cuz i was chilling into this incident

Author  Cutemloose Fam (100001001099045)
  Sent  2018-11-12 01:17:33 UTC
  Body  ugh

Author  Cutemloose Fam (100001001099045)
  Sent  2018-11-12 01:17:21 UTC
  Body  I'm not for no scolding. It just hurts my heart cuzz. Truly hurts me

Author  Sts Pistol Tony (100002075016114)
  Sent  2018-11-12 01:17:09 UTC

Body
        Thats a fendi

Author  Cutemloose Fam (100001001099045)
  Sent  2018-11-12 01:16:40 UTC
  Body  u gotta be tired. you been through so much. just like me. Too
        much. and your still going.

Author  Sts Pistol Tony (100002075016114)
  Sent  2018-11-12 01:16:24 UTC
  Body  Factz ova tired

Author  Sts Pistol Tony (100002075016114)
  Sent  2018-11-12 01:16:09 UTC
  Body  Factz tryna get me to come to the bank i am starting ova im
        paying for a hotel 300 a week

Author  Cutemloose Fam (100001001099045)
  Sent  2018-11-12 01:16:02 UTC
  Body  a fucking nightmare geez. A fucking nightmare. You not tired?
```

This passage of messages should be excluded at trial.  The government has not identified any probative value of these posts.  The government already has substantial

8

evidence that Mr. Shipp knew he was wanted by the police, that he was in hiding, and that he was short on money. The additional facts expressed by Mr. Shipp's messages that the police were trying to get him to come to the bank and that he had to pay $300 a week for the hotel he was staying in have limited probative value, at best, to the question of whether he knowingly and intentionally possessed the charged firearm and ammunition on July 20, 2018. The risk of unfair prejudice outweighs any minimal probative value because of the danger the jurors will give undue weight to the police taking steps such as freezing Mr. Shipp's bank account or monitoring his bank account as indicating a certainty that Mr. Shipp was involved in the shooting.

Furthermore, the phrase "chilling into this incident" is highly ambiguous. The government seems to read it as an admission of some kind as to the shooting; but, it is equally plausibly read to mean that Mr. Shipp is hurt because he was relaxing until the police began to wrongly suspect him of the shooting and sought him for questioning. This ambiguity gives it only limited probative value but does not cure the risk of unfair prejudice, which has a constitutional dimension: if the government offers it into evidence as a confession, Mr. Shipp would be powerless to remedy the misreading of it without taking the stand, resulting in substantial prejudice to his Fifth Amendment rights. *See United States v. Marin*, 669 F.2d 73 (2d Cir. 1982) (observing that a defendant's Fifth Amendment rights may be implicated when the government offers in evidence a defendant's statements).

Finally, there is no probative value whatsoever in the opinions expressed by "Cutemloose Fam" (whoever that may be) that Mr. Shipp must be tired, that he has been through a lot, that he is still going, and that it hurts Cutemloose Fam's heart to think about what Mr. Shipp is going through, and could lead the jury, like Cutemloose Fam, to arrive at a negative judgment of Mr. Shipp, based not in actual evidence but in the hearsay messages of an unknown person expressing concern about his actions.

In sum, these November 12, 2018 messages are of only limited probative value, ambiguous, and carry a risk of unfair prejudice.

## V.    Detective Jeffrey Bahm's Testimony Should Be Consistent With The Limitations Set Forth In The Court's Previous Ruling.

The government confirms that it does not object to applying the Court's prior ruling to the government's new firearm examiner. *See* Govt Resp., ECF 55 at 8. The government, however, objects to the defense's request for an instruction to the witness that ensures the examiner does not circumvent the Court's ruling.

If an examiner is permitted to opine that individual characteristics are unique to a specific firearm, the examiner functionally is testifying to a match between the gun and the recovered cartridge casings, bullet fragments and test-fire casings. This testimony violates the Court's ruling that the examiner "may not testify, to any degree of certainty, that the recovered firearm is the source of the recovered bullet fragment or recovered casing." *See Memorandum and Order*, ECF 39 at 32. To prevent this, the defense requests that the examiner be precluded from asserting that individual characteristics are unique to one specific gun.

## VI. Attempted Murder And Similarly Inflammatory Terms Should Not Be Used At This Gun Possession Trial.

The government's response to the motions *in limine* raises a new concern: the government refers to the "defendant's attempted murder of a victim." *See* Govt Resp., ECF 55 at 1. Mr. Shipp is not charged with attempted murder. Were the government to raise this specter before the jury, it would be highly inflammatory and endanger the fairness of his trial on the charged conduct. Mr. Shipp is charged with possessing a gun found in a dumpster a few blocks from the shooting and with possessing ammunition that its ballistics examiner will claim matches that gun. The Court should preclude the government from making such inflammatory references to uncharged conduct under Rule 403.

## Conclusion

For the foregoing reasons, and reasons set forth in Mr. Shipp's original motion *in limine*, Mr. Shipp respectfully requests that the Court grant his motions.

Respectfully Submitted,
/s/
Ashley M. Burrell
Deirdre D. von Dornum
*Attorneys for Alonzo Shipp*

cc: AUSA Philip Pilmar
AUSA Michael Gibaldi
Mr. Alonzo Shipp