UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES,

              -against-                        **MEMORANDUM AND ORDER**
                                                      19-CR-29 (RPK-1)

ALONZO SHIPP,

                   Defendant.
-------------------------------------------------------x

RACHEL P. KOVNER, United States District Judge:

        After a jury trial, defendant Alonzo Shipp was convicted of possessing a firearm following a felony conviction and possessing ammunition following a felony conviction. Shipp has moved for a judgment of acquittal or for a new trial. Shipp's motion is denied.

## BACKGROUND

        The superseding indictment in this case charged Shipp in two counts. Count One charged Shipp with possessing a Sig Sauer 9mm firearm on or about July 20, 2018, after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). Superseding Indictment at 1 (Dkt. #45). Count Two charged Shipp with possessing a Jagemann 9mm Luger caliber cartridge case on or about the same date after having been previously convicted of a felony, in violation of the same statute. *Id.* at 1-2.

        The case was tried before a jury. The government sought to establish at trial that Shipp possessed the charged gun and ammunition in the early morning hours of July 20, 2018, when he shot Reginald Cooke in front of 117-26 147th Street in Jamaica, Queens. *See* Gov't Opening, Trial Tr. 5:12-7:9 (Nov. 12, 2020); Gov't Summation, Trial Tr. 630:23-631:2 (Nov. 17, 2020).

        In support of that theory, the government offered video, audio, testimonial, physical, and ballistics evidence that Shipp had shot Cooke. A surveillance video showed that a man in a white

shirt shot a firearm at another man in front of 117-26 147th Street. Gov't Ex. 21; *see* Test. of Patrick Nozdrovicky, Trial Tr. 364:22-367:2 (Nov. 13, 2020). Additional videos showed Cooke running down 119th Avenue from the direction of 147th Street and collapsing on 119th Avenue and Sutphin Boulevard. Gov't Ex. 22, 23; *see* Test. of Patrick Nozdrovicky, Trial Tr. 367:7-375:12 (Nov. 13, 2020). Cooke called 911 and explained that he was on the corner of 119th Avenue and Sutphin Boulevard and that his shooter was coming toward him. Gov't Ex. 3. The videos then showed a man in a white shirt walking up to Cooke, standing over him, and pointing a gun, before walking away under a surveillance camera. Gov't Ex. 22, 23; *see* Test. of Patrick Nozdrovicky, Trial Tr. 367:7-375:12 (Nov. 13, 2020). An NYPD officer testified that he responded to the call and found Cooke with a gunshot wound. *See* Test. of Andrea Fico, Trial Tr. 18:1-19:12 (Nov. 12, 2020). A trauma surgeon then treated Cooke and recovered bullet fragments from his body. *See* Gov't Ex. 16-A; Test. of Katherine McKenzie, Trial Tr. 41:4-44-8 (Nov. 12, 2020).

The government asked the jury to identify the man in the white shirt in those surveillance videos as the defendant. *See* Trial Tr. 477:9-478:2 (Nov. 17, 2020); Gov't Summation, Trial Tr. 637:1-19 (Nov. 17, 2020). The government also relied on evidence that Cooke identified his shooter as a man named "Pump." During the 911 call, Cooke addressed his shooter as "Pump," Gov't Ex. 3, and the officer who responded to the 911 call testified that Cooke again identified his shooter as "Pump." *See* Test. of Andrea Fico, Trial Tr. 18:1-19:15 (Nov. 12, 2020). The evidence at trial that "Pump" was the defendant's nickname included e-mails from the defendant that he signed as "pumpy," Gov't Ex. 26-A, 26-B, a Facebook message from the defendant where he stated, "[m]y name is Pump," Gov't Ex. 28-B, and a tattoo of that nickname on the defendant's arm, Gov't Ex. 27. The government also offered Facebook messages in which the defendant later implicated himself in the shooting, including a message in which the defendant stated that he was

on the run from a shooting at "119 stuphin" and that "they got my pics." Gov't Ex. 28-C; *see* Test. of Kiran Mathew, Trial Tr. 60:11-62:21 (Nov. 12, 2020).

The government offered additional evidence to establish that Shipp shot Cooke using the particular gun and ammunition charged in the indictment. The same videos that showed a man in a white shirt standing over Cooke and pointing a gun over him also showed that, afterward, that man headed northbound on Sutphin Boulevard, in the direction of an auto repair shop—R&R Auto Repair—on Sutphin Boulevard and Foch Avenue. *See* Gov't Ex. 22, 23; *see* Test. of Patrick Nozdrovicky, Trial Tr. 373:21-374:1 (Nov. 13, 2020). An additional video obtained from a nearby gas station showed a person wearing the same clothes walking from the direction of 119th Avenue and Sutphin Boulevard toward R&R Auto Repair. *See* Gov't Ex. 24; *see* Test. of Patrick Nozdrovicky, Trial Tr. 375:13-378:1 (Nov. 13, 2020). The person could be observed standing for several seconds at the front of the building and then walking away. *See* Gov't Ex. 24.

The government offered evidence that the gun described in the indictment—a Sig Sauer 9mm firearm—was recovered from a dumpster at R&R Auto Repair at about 8 a.m. on the morning of the shooting. *See* Gov't Ex. 8; Test. of Connie Duncan, Trial Tr. 77:2-102:3. (Nov. 12, 2020). The government also offered evidence that the firearm had been deposited in the dumpster during the overnight hours. The owner of R&R Auto Repair testified that he had not seen a gun in the dumpster when he took the dumpster out for trash collection the day before. *See* Test. of Rajbaul Samaroo, Trial Tr. 139:15-17 (Nov. 12, 2020). An administrator for a private sanitation company called Bestway Carting, Inc., testified that the dumpster at the business next to R&R Auto Repair was emptied at 10:17 p.m. the night before. *See* Test. of Dawn Torres, Trial Tr. 188:8-9 (Nov. 13, 2020). A driver for Bestway testified that he did not see a gun when he emptied the dumpster for R&R Auto Repair. *See* Test. of German Peralta, Trial Tr. 206:13-18 (Nov. 13, 2020). And the

owner of R&R Auto Repair stated that he saw the gun in the dumpster when took the dumpster back in the next morning. *See* Test. of Rajbaul Samaroo, Trial Tr. 138:10-16 (Nov. 12, 2020). The NYPD officer who recovered the gun further testified that the firearm was one of only two items in the dumpster when it was recovered. *See* Test. of Connie Duncan, Trial Tr. 79:17-80:3 (Nov. 12, 2020).

With respect to the ammunition described in the indictment—a Jagemann 9mm Luger caliber cartridge casing—the government offered evidence that a Jagemann cartridge case was recovered in front of 117-26 147th Street, where the shooting occurred, hours after the shooting. *See* Gov't Ex. 4-E, 20D, 20E; Test. of Jennifer McKeon, Trial Tr. 226:9-232:9 (Nov. 13, 2020); Test. of Patrick Nozdrovicky, Trial Tr. 330:10-331:11 (Nov. 13, 2020). The government also offered testimony that two bullet fragments were recovered several houses away from the cartridge case, on the corner of 147th Street and 119th Avenue. *See* Gov't Ex. 4-A, 4-C; Test. of Jennifer McKeon, Trial Tr. 218:18-20, 240:23-241:2 (Nov. 13, 2020). And the same type of Jagemann cartridge case was found jammed inside the firearm recovered from the dumpster. *See* Gov't Ex. 4-E, 11-A; Test. of Connie Duncan, Trial Tr. 77:2-81:5, 86:1-88:24 (Nov. 12, 2020).

The government then offered ballistics evidence to link the recovered Jagemann cartridge casing with the recovered Sig Sauer firearm. *See* Gov't Summation, Trial Tr. 642:15-643:1 (Nov. 17, 2020). As particularly relevant to the defendant's motion for a new trial, the government called Detective Jeffrey Bahm to testify "as an expert in microscopic comparison of ballistics evidence and the operability examinations of firearms." Test. of Jeffrey Bahm, Trial Tr. 482:19-25 (Nov. 17, 2020). Detective Bahm testified that he had examined the Sig Sauer firearm recovered from the dumpster, *see* Gov't Ex. 8, the Jagemann shell casing recovered from 147th Street, *see* Gov't Ex. 4-E, the bullet fragments recovered from the corner of 119th Avenue and 147th Street, *see*

4

Gov't Ex. 4-A, 4-C, and the bullet fragments recovered from Reginald Cooke, *see* Gov't Ex. 16-A. *See* Test. of Jeffrey Bahm, Trial Tr. 495:24-25, 501:18-20, 502:1-9, 511:2-7 (Nov. 17, 2020). He testified that he had confirmed that the recovered Sig Sauer firearm was operable, meaning that it could fire a live cartridge. *See id.* at 511:8-512:11. He then testified that he used the recovered Sig Sauer firearm to test-fire Jagemann cartridges. *See id.* at 512:12-513:1, 515:12-516-10. He further testified that he had performed a microscopic comparison of his test-fired cartridges with the recovered ballistics evidence to determine whether the evidence had marks consistent with having been fired from the recovered firearm. *See id* at 513:5-515-3. Detective Bahm explained that the Jagemann cartridge case recovered from 147th Street and one of the bullet fragments recovered from the nearby corner each bore impressions consistent with having been fired from the recovered firearm. *See id.* at 519:9-25, 521:5-13. His microscopic comparison analysis was "inconclusive," however, as to the other bullet fragment recovered from the corner of 119th and 147th Street and the bullet fragments recovered from Reginald Cooke. *See id.* at 518:7-13. For those fragments, there were not enough "individual characteristics for [him] to see under the microscope to make an identification one way or the other." *Id.* at 518:14-18; *see id.* at 520:10-25.

In a portion of Detective Bahm's testimony that Shipp now argues exceeded the scope of the government's expert disclosures—but to which Shipp did not object during trial—Detective Bahm discussed "trocars," which he described as small pieces of a bullet designed to break off from the bullet's base. *Id.* at 517:2-7. After explaining that he chose "Jagemann cartridges to test fire because the two cartridge cases that were recovered from the scenes in this case were Jagemann cartridge cases," Detective Bahm testified that he learned during the course of his examination that Jagemann had filled "[t]his particular Jagemann ammunition" with bullets manufactured by another company that were "designed in such a way so that they fragment in flight." *Id.* at 515:19-

23, 516:17-25. He defined the small pieces of the bullet that would break off as "trocars," and he explained that the bullet with trocars would "become like many small projectiles being fired at a target." *Id.* at 517:5-7. Detective Bahm was then asked whether there was "something about the[] bullet fragments" recovered from Cooke's body "that made it harder for [him] to conduct" microscopic comparison analysis. *Id.* at 518:19-20. He responded by citing the fact that the "bullet fragments are particularly small," noting that they "appear to be trocars from one of those specific types of bullets and those trocars, because they fragment in flight, they don't . . . bear a lot of markings from inside the barrel." *Id.* at 518:21-519:2.

On cross-examination, the defense sought to elicit testimony from Detective Bahm relating to "full metal jacket" cartridges recovered from the Sig Sauer firearm. The defense asked Detective Bahm to agree with the statement that "typically full metal jackets do not explode" when they hit a soft object. *See* Test. of Jeffrey Bahm, Trial Tr. at 531:20-532:6 (Nov. 17, 2020). Detective Bahm did not agree that full metal cartridges "don't explode" when "they hit a soft object" or that "typically full metal jackets do not explode." *Ibid.* Rather, Detective Bahm stated that "[b]ullets will fragment depending on different factors," and that he has "seen full metal jackets that have fragmented." *Id.* at 532:1-3. Defense counsel also asked Detective Bahm if he had compared his results to any "national database of tool marks." *Id.* at 537:12-19; *see id.* at 538:18-20. Detective Bahm explained that there was a database called the FBI General Rifling Characteristics Database, but he did not use it for his examination. *See id.* at 538:18-20. He also stated that it "would be impossible" to use that database for the recovered cartridge cases because it "is a database only for bullets." *Id.* 558:9-16.

Through a different expert, the government offered testimony that both the recovered firearm and recovered cartridge case had been manufactured outside the State of New York. *See* Test. of Howard Stern, Trial Tr. 572:19-573:20, 574:11-576-1 (Nov. 17, 2020).

The parties also stipulated that Shipp had been convicted of a felony before the date on which he allegedly possessed the firearm and ammunition charged in the indictment, and that he knew as much. Gov't Ex. 30; Trial Tr. 13:11-14:4 (Nov. 12, 2020).

The defense called one witness. The witness, who was a defense investigator, testified that several individuals with criminal records resided at the address where the shooting occurred. *See* Test. of Waleska Miller, Trial Tr. 595:13-598-4 (Nov. 17, 2020). She also identified businesses on Sutphin Boulevard with surveillance video that the government failed to obtain. *Id.* at 601:6-603:25. In addition, she testified that Reginald Cooke had a conviction for sex trafficking and attempted criminal possession of a weapon, *id.* at 605:16-609:7, and that Cooke had misled his parole officer about using marijuana, *see id.* at 610:15-611:13.

In closing, the defense argued that "[t]he Government's entire case rises and falls on a video and their accusations that the person in the video is Mr. Shipp." Def.'s Closing, Trial Tr. 655:2-4 (Nov. 18, 2020); *see id.* at 664:21-665:3 ("[T]he surveillance videos . . . were a centerpiece for the Government's case, but they also don't really support the charges against Mr. Shipp."). The defense argued that the videos were often too blurry to constitute proof beyond a reasonable doubt. *See id.* at 665:4-12. And the defense asked the jury not to find that the man in the video was Shipp from a video without "any distinguishing features." *Id.* at 655:2-14.

The defense then emphasized witnesses that the government never called, *see id.* at 658:19-662:15, evidence that the government failed to test, *see id.* at 687:11-3, and surveillance footage that the government failed to recover, *see id.* at 687:12-16. With respect to the ballistics evidence,

the defense emphasized that the recovered firearm and the shooting "began as two separate cases," *id.* at 668:1-6, and that Detective Bahm was not a "neutral" or "independent" examiner, *id.* at 669:5-17. The defense further emphasized that what Detective Bahm determined was that the evidence was "inconclusive"; he found that the bullet fragments recovered from Cooke to be inconclusive evidence, and he could only say that the casing "could not be excluded as a shell casing that was fired from the gun." *Id.* at 669:18-6.

With respect to the recovered firearm and the recovered ammunition, the defense argued that "the ultimate reason to doubt" was that Shipp's DNA was not found either on the gun in the dumpster or the shell casing on the sidewalk. *See id.* at 684:22-685:1. The defense also noted the lack of fingerprints on either. *See id.* at 674:12-18. The defense argued that the surveillance video where the defendant allegedly deposited the firearm in the dumpster was unclear because the video had no time or date stamp and only depicted "shadowy figures." *See id.* 676:2-14. Finally, the defense highlighted that the bullet fragments recovered on the street where the shooting occurred were recovered several houses away from the recovered shell casing. *See id.* at 672:17-22.

The jury convicted the defendant on both counts. *See* Jury Verdict (Dkt. #143).

Shipp now moves for a judgment of acquittal under Federal Rule of Criminal Procedure 29 and for a new trial under Rule 33. *See* Def.'s Mot. for New Trial or J. of Acquittal on Behalf of Def. Alonzo Shipp at 2 (Dkt. #148) ("Def.'s Memo"). In seeking a judgment of acquittal, Shipp concedes that the evidence, taken in the light most favorable to the government, established that he shot or tried to shoot Cooke on July 20, 2018. *See* Def.'s Memo. at 2. But he argues that the evidence was insufficient to establish beyond a reasonable doubt that he possessed the gun and ammunition charged in the indictment. *Ibid.*

Shipp argues that he is entitled to a new trial on two grounds. First, he argues that a new trial is warranted because Detective Bahm's testimony regarding trocars went beyond the scope of the government's expert disclosure. *See id.* at 14-17. Second, he argues that he is entitled to a new trial because Detective Bahm committed perjury. *See id.* at 17-20. In making that claim, he principally relies on Detective Bahm's testimony that Jagemann "buys . . . bullets from [a] bullet manufacturer and seats them in their cartridges," *see* Test. of Jeffrey Bahm, Trial Tr. 516:21-23 (Nov. 17, 2020), testimony that Jagemann ammunition contained bullets that "fragment in flight," as opposed to fragmenting on contact with an object, *see id.* at 516:23-25, testimony that Detective Bahm couldn't "say for sure" whether "full metal jacket cartridges . . . explode" when "they hit a soft object," *see id.* at 531:24-532:6, and testimony that the FBI General Rifling Characteristics Database was a database "only for bullets," as opposed to a database for bullets and cartridge cases, *see id.* at 558:10-16.

## DISCUSSION

### I. Shipp is not entitled to a judgment of acquittal.

Shipp is not entitled to acquittal on either charge against him. "A defendant bears a 'heavy burden' when he attacks a criminal conviction on the basis of insufficient evidence." *United States v. Delgado*, 972 F.3d 63, 72 (2d Cir. 2020) (quoting *United States v. Tanner*, 942 F.3d 60, 64 (2d Cir. 2019)). While a court must enter a judgment of acquittal when "the evidence is insufficient to sustain a conviction," Fed. R. Crim. P. 29(a), a conviction will be upheld "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *United States v. Bramer*, 956 F.3d 91, 96 (2d Cir. 2020). In making this assessment, a court must "view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Delgado*, 972 F.3d at 72.

Shipp has not met the heavy burden for overturning a jury verdict. Shipp concedes that the government's video, audio, testimonial, physical, and ballistics evidence permitted jurors to conclude that he shot or tried to shoot Cooke on 119th Avenue and Sutphin Boulevard on July 20, 2018. *See* Def.'s Memo at 2. He argues, instead, that the evidence was insufficient to support a finding that he possessed the particular Sig Sauer 9mm firearm and Jagemann shell casing charged in the indictment. *See id.* But it was rational for jurors to find that he possessed both items.

As to the gun, the government presented evidence from which jurors could reasonably infer that Shipp used the Sig Sauer firearm charged in the indictment to shoot or attempt to shoot Cooke. Once a juror reasonably concludes that Shipp shot or attempted to shoot Cooke at the intersection of 119th Avenue and Sutphin Boulevard on July 20, 2018, it does not take much to reasonably conclude that Shipp was the person who deposited a firearm in a dumpster nearby around the same time. *Cf. United States v. Lee*, 758 F. App'x 80, 82 (2d Cir. 2018) (summary order) (affirming denial of motion for acquittal from a conviction under 18 U.S.C. § 922(g)(1) where "officers saw [the defendant] flee the scene of a suspected shooting holding a bagged object in a manner consistent with one holding a firearm" and "later recovered a black bag from a tree and a loaded firearm approximately 20 to 25 feet away from Lee's crashed vehicle following a brief vehicle chase"); *United States v. Robinson*, No. 16-CR-545, 2021 WL 62076, at *13 (E.D.N.Y. Jan. 6, 2021) (rejecting motion for judgment of acquittal because "the evidence was legally sufficient to conclude that defendant committed [a] robbery," so "the jury could also reasonably conclude that defendant subsequently hid the gun . . . on . . . nearby property").

Indeed, the government presented ample evidence to support the inference that Shipp dropped his firearm into the dumpster outside R&R Auto Repair after his encounter with Cooke. The same surveillance videos from which a juror could conclude that Shipp stood over Cooke and

pointed a gun over him also showed that, afterward, he headed northbound on Sutphin Boulevard, in the direction of R&R Auto Repair. *See* Gov't Ex. 22, 23. A video obtained from a gas station across from R&R Auto Repair also showed a person wearing the same clothes as the defendant walking from the direction of 119th Avenue and Sutphin Boulevard toward R&R Auto Repair, standing for several seconds at the front of the building, and then walking away. *See* Gov't Ex. 24.

The government also offered substantial evidence that the Sig Sauer firearm later recovered from the dumpster had been hidden there in the overnight hours. The owner of R&R Auto Repair testified that he had not seen a gun in the dumpster when he took the dumpster out for trash collection the day before. *See* Test. of Rajbaul Samaroo, Trial Tr. 139:15-17 (Nov. 12, 2020). An administrator for Bestway testified that the dumpster at the business next to R&R Auto Repair was emptied at 10:17 p.m. the night before. *See* Test. of Dawn Torres, Trial Tr. 188:8-9 (Nov. 13, 2020). A driver for Bestway testified that he did not see a gun when he emptied the dumpster for R&R Auto Repair. *See* Test. of German Peralta, Trial Tr. 206:13-18 (Nov. 13, 2020). And the owner of R&R Auto Repair stated that he saw the gun in the dumpster when took the dumpster back in the next morning. *See* Test. of Rajbaul Samaroo, Trial Tr. 138:10-16 (Nov. 12, 2020). The NYPD officer who recovered the gun then testified that the firearm was one of only two items in the dumpster when it was recovered. *See* Test. of Connie Duncan, Trial Tr. 79:17-80:3 (Nov. 12, 2020). That sequence supports the inference that the recovered firearm came from Shipp after his encounter with Cooke mere blocks away.

The physical and ballistics evidence in the trial record provides further reason to think that the Sig Sauer firearm recovered from the dumpster was the firearm that Shipp used to shoot or attempt to shoot Cooke. The officer who recovered the firearm testified that a Jagemann cartridge case was jammed inside the firearm when she found it. *See id.* at 77:2-81:5, 86:1-88:24. That

same kind of cartridge case was recovered at a site where surveillance video and other evidence indicated that Shipp shot Cooke. *See* Gov't Ex. 4-E, 21; Test. of Jennifer McKeon, Trial Tr. 226:9-232:9 (Nov. 13, 2020). What's more, Detective Jeffrey Bahm stated, in testimony indisputably within the scope of the government's disclosures, that the Jagemann cartridge case recovered from the site of the shooting bore impressions consistent with having been fired from the Sig Sauer firearm recovered from the dumpster. *See* Test. of Jeffrey Bahm, Trial Tr. 521:1-15 (Nov. 17, 2020). Viewed in the light most favorable to the government, the totality of this evidence was sufficient to support a jury determination that the Sig Sauer 9mm handgun recovered from the R&R Auto Repair dumpster and charged in the indictment was the gun that Shipp used to shoot Cooke.

In arguing to the contrary, Shipp emphasizes that the government had no direct evidence that connected him with the recovered handgun. *See* Defense Letter at 2; Def.'s Memo at 21. But a "jury's verdict may be based entirely on circumstantial evidence." *United States v. Friedman*, 300 F.3d 111, 124 (2d Cir. 2002). And "jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences." *United States v. Huezo*, 546 F.3d 174, 182 (2d Cir. 2008). Here, as explained above, there was sufficient circumstantial evidence that the defendant possessed the Sig Sauer gun recovered from R&R Auto Repair to "to permit a rational juror to find that the element . . . established beyond a reasonable doubt." *Friedman*, 300 F.3d at 124. Shipp specifically emphasizes that "no forensic evidence" such as "DNA or fingerprints" connected the defendant to the charged handgun. Def.'s Memo at 21. But the government offered testimony as to why such forensic evidence may be absent, *see* Test. of Meredith Napor, Trial Tr. 306:1-19 (Nov. 13, 2020), and forensic evidence is not required for the jury to sustain a conviction for possessing a firearm after a felony conviction.

For similar reasons, there was sufficient evidence to support the jury's conclusion that the defendant possessed the Jagemann cartridge case charged in the indictment. Jurors could infer from surveillance video, the recorded 911 call, and other evidence that Shipp shot Cooke at 117-26 147th Street on the morning of July 20, 2018. *See* pp. 1-2, *supra*. And a Jagemann 9mm Luger cartridge casing was recovered on the sidewalk at that location, later the same morning. *See* Test. of Jennifer McKeon, Trial Tr. 240:19-247:12 (Nov. 13, 2020). Moreover, as explained above, a juror could rationally conclude that Shipp used the recovered Sig Sauer firearm to shoot Cooke, and that firearm was found with a Jagemann cartridge jammed inside. *See* pp. 10-12. Lastly, as explained above, Detective Bahm testified that the recovered cartridge case had firing pin and breach face impression that were consistent with having been fired from the recovered Sig Sauer firearm. *See* Test. of Jeffrey Bahm, Trial Tr. 521:1-13 (Nov. 17, 2020). The jury was entitled to rely on the totality of this evidence to find that the charged casing was the same ammunition that the defendant used to shoot Reginald Cooke.

Finally, Shipp is not entitled to a judgment of acquittal on the ammunition charge on the ground that when at the time it was recovered, the Jagemann cartridge charged in the indictment was merely a "spent shell casing" that does not qualify as "ammunition" for purposes of a felon-in-possession offense. *See* Defense Letter at 2. "[T]he government's theory of the case was not that [the defendant] possessed a spent shell casing in the aftermath of the shooting, but rather that he possessed live ammunition when he shot the victim." *United States v. Thomas*, 765 F. App'x 553, 556 (2d Cir. 2019) (summary order). That is, the government contended at trial that Shipp possessed the cartridge when he shot Reginald Cooke, before it was merely a spent shell casing. Gov't Memo. of L. in Opp'n to Def.'s Mot. for a New Trial and Acquittal at 40 (Dkt. #152) ("Gov't Memo"); *see* Gov't Opening, Trial Tr. 6:23-25 (Nov. 12, 2020); Gov't Summation, Trial

Tr. 631:21-23 (Nov. 17, 2020).  The fact that the Jagemann cartridge was a spent shell casing when officers recovered it after the shooting is of no moment.  Sufficient evidence supported the jury's conclusion that Shipp possessed the firearm and ammunition charged in the indictment.

## II.    Shipp is not entitled to a new trial.

Shipp is also not entitled to a new trial.  Federal Rule of Criminal Procedure 33 authorizes a court to "vacate any judgment and grant a new trial if the interest of justice so requires."  But this discretion should be exercised only "sparingly" and "in the most extraordinary circumstances."  *United States v. Gramins*, 939 F.3d 429, 444 (2d Cir. 2019).  The "ultimate test is whether letting a guilty verdict stand would be a manifest injustice."  *United States v. Walker*, 974 F.3d 193, 208 (2d Cir. 2020).  This typically means that a court must have "a real concern that an innocent person may have been convicted" on the evidence presented.  *Ibid.*

### A.    Shipp is not entitled to a new trial on the grounds that Detective Bahm testified beyond the scope of the government's expert disclosures.

Shipp first argues that he is entitled to a new trial based on a violation of Federal Rules of Criminal Procedure 16(a)(1)(G).  That rule requires the government, upon request, to give "a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial."  Fed. R. Crim. P. 16(a)(1)(G).  The summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."  *Ibid.*

Shipp represents that he requested that the government summarize its proposed expert testimony relating to ballistics analysis.  *See* Def.'s Memo at 3.  The government ultimately advised the Court and defendant in advance of trial that Detective Bahm would "testify as to his process of examining the recovered firearm, determining its operability and test firing it"; "describe the theory of toolmark analysis and how firearms can leave markings on bullets and shell casing"; and

14

"describe the process of comparing [a] recovered shell casing and bullet fragments to the test fires and identify the similarities between them." Gov't Letter at 8 (Feb. 17, 2020) (Dkt. #55). The government further disclosed that Detective Bahm would "testify that the toolmarks on [a] recovered bullet fragment and [a recovered] shell casing are consistent with having been fired from the recovered firearm, and that the recovered firearm cannot be excluded as the source of the recovered bullet fragment and shell casing." *Ibid.* The government stated that Detective Bahm would not testify "to any degree of certainty, that the recovered firearm is the source of the recovered bullet fragment or the recovered shell casing." *Ibid.*

Shipp argues that the government's expert notice was deficient because the government did not specify that Detective Bahm would testify that "Jagemann ammunition has a very particular type of bullet that gets seated into the cartridge case," *see* Def.'s Memo at 10 (quoting Test. of Jeffrey Bahm, Trial Tr. 516:11-23 (Nov. 17, 2020)); that these bullets are bullets with trocars "designed in such a way so that they fragment in flight," *id.* at 11 (Test. of Jeffrey Bahm, Trial Tr. 516:23-517:7 (Nov. 17, 2020)), and that the bullet fragments recovered from Reginald Cooke's body were "fragments [that] appear to be trocars from one of these specific types of bullets," *id.* at 11-12 (quoting Test. of Jeffrey Bahm, Trial Tr. 18:19-519:2 (Nov. 17, 2020)).

To receive a new trial based on a deficient expert disclosure, a defendant must show not only that the disclosure was inadequate under Rule 16, but also that this violation "caused him substantial prejudice." *United States v. Vinas*, 910 F.3d 52, 60 (2d Cir. 2018)*; see United States. v. Farhane*, 634 F.3d 127, 160 (2d Cir. 2011) (requiring defendant to show the "violation of a substantial right" to obtain reversal of a conviction based on such "evidentiary error[s]"). The substantial prejudice must stem "from the government's untimely disclosure . . . rather than [from] the prejudice attributable to the evidence itself." *United States v. Sanchez*, 912 F.2d 18, 23

(2d Cir. 1990). Moreover, when—as here—a defendant fails to object to a Rule 16 violation at trial, any violation is subject to plain-error review. *See United States v. Awad*, 518 F. Supp. 2d 577, 582 (S.D.N.Y. 2007) ("The plain error standard used in appellate review applies in the trial court to post-trial claims that could have been but were not raised during trial."), *aff'd*, 369 F. App'x 242 (2d Cir. 2010). Under that standard, a new trial is proper only if "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights; and (4) the error seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Walker*, 974 F.3d at 202. Shipp has not demonstrated that he is entitled to a new trial based on deficient expert disclosure under these standards.

### 1. Shipp has not demonstrated substantial prejudice from the testimony that he alleges went beyond the government's expert disclosures.

Assuming that the government's disclosure was clearly or obviously deficient because it did not include Detective Bahm's testimony regarding trocars, Shipp has not demonstrated that this deficiency caused him substantial prejudice. To show substantial prejudice, "the defendant must demonstrate that the untimely disclosure of the [evidence] adversely affected some aspect of his trial strategy." *Walker*, 974 F.3d at 204. In assessing whether any prejudice to the defendant was substantial, "the court analyzes the nature of the evidence" in question, "the extent to which it bore on critical issues in the case, the reason for its nonproduction, and the strength of the government's untainted proof." *Vinas*, 910 F.3d at 60-61.

Shipp principally argues that he suffered substantial prejudice because he "pursued a theory that the government had no evidence connecting Cooke's shooting to the gun and shell casing charged," Def.'s Memo at 16, and Detective Bahm's testimony regarding trocars connected "the fragments recovered from Reginald Cooke" to "the nature of the bullets that had been loaded in recovered shell casings," *id.* at 15. But Shipp offers little reason to conclude that any inadequate

disclosure "adversely affected [an] aspect of [his] trial strategy" to challenge the connection between Cooke's shooting, the gun, and the shell casing charged. *Walker*, 974 F.3d at 204. Shipp does not suggest, for instance, that he would have pivoted away from his trial strategy of attacking the absence of a forensic connection between the shooting of Cooke and the recovered gun and bullets if the trocar testimony had been disclosed. On the contrary, the absence of such a forensic connection is part of the basis for Shipp's post-trial motion for a judgment of acquittal. *See* Def.'s Memo at 22.

Instead, Shipp suggests that the government's assertedly deficient disclosure adversely affected his trial strategy because he would have taken additional investigative steps if he had received advance notice of the trocar testimony—specifically, "consult[ing] a ballistics expert on this point in advance of trial" and "sp[eaking] to the manufacturer of the shell casing." Def.'s Memo at 16. But even though Shipp has now taken those steps after trial, he has not identified how those investigative measures would have materially affected the defense he presented. Shipp simply states at a high level of generality that he would have "filed a motion seeking to preclude" the trocar testimony and, if the motion were unsuccessful, "attack[ed] the veracity of this testimony on cross-examination." *Ibid*. These very general statements do not suggest that his trial strategy would have been materially altered by advance disclosure of the trocar testimony. *Cf. Walker*, 974 F.3d at 204 (defendant failed to show that later disclosure had adversely affected his trial strategy when defendant suggested that the late disclosure impaired his presentation of a misidentification defense, but "misidentification was the defense he presented to the jury").

The closest that the defense comes to articulating a specific change in strategy is to emphasize that they hoped to elicit at trial that "the bullets that hit Mr. Cooke's abdomen . . . fragmented into shrapnel inside his body, while the bullets recovered from the gun in the dumpster

were round nose full metal jacket bullets . . . , which do not fragment when they hit soft tissue." Defs.' Memo at 16. Defense counsel notes that it had evidence that the gun in the dumpster contained some full metal jacket bullets, *ibid*., in addition to the jammed Jagemann cartridge, Gov't Ex. 11-A. Presumably, defense counsel anticipated that it would elicit testimony on cross-examination from Detective Bahm that full metal jacket bullets do not fragment when they hit soft tissue. But the defense does not explain how belated notice of Detective Bahm's testimony about trocars adversely affected that strategy. And defense counsel continued to highlight the full metal jacket bullets recovered with the firearm even after Detective Bahm's testimony on direct examination regarding trocars, *see* Jeffrey Bahm, Trial Tr. 531:20-532:6 (Nov. 17, 2020), suggesting that inadequate pretrial disclosures regarding trocars did not materially change the defense that defendant pursued, *cf. Walker*, 974 F.3d at 204.

In any event, Shipp's suggestion that he suffered substantial prejudice as a result of Detective Bahm's trocar testimony is undercut by "the strength of the government's untainted proof." *Vinas*, 910 F.3d at 60-61; *see United States v. Lee*, 834 F.3d 145, 159-61 (2d Cir. 2016) (strength of the government's case supported conclusion that Rule 16 violation did not substantially prejudice the defense); *see also Walker*, 974 F.3d at 204. The untainted evidence connecting Cooke's shooting to the charged gun and ammunition was substantial. As previously explained, substantial evidence supports a jury finding that defendant shot or attempted to shoot Reginald Cooke in front of 117-26 147th Street on July 20, 2018. *See, e.g.*, pp. 1-2, *supra*; Gov't Memo at 3-4; Gov't Ex. 3, 4-E, 21. Shipp concedes video and other evidence could also support a jury finding that defendant shot or attempted to shoot Reginald Cooke on the corner of 119th Avenue and Sutphin Boulevard minutes later. *See* Def.'s Memo at 2. And as detailed above, ample evidence apart from Detective Bahm's trocar testimony supported jurors' conclusion that

Shipp used the gun and ammunition charged in the indictment to shoot Cooke. *See* pp. 10-14, *supra.* That evidence included the video evidence that appears to show Shipp walking to R&R Auto Repair immediately after the shooting and stopping there briefly, Gov't Ex. 24; the testimony and related evidence indicating that the recovered firearm had been left in the dumpster at R&R Auto Repair near the time of the shooting, *see, e.g.*, Test. of Rajbaul Samaroo, Trial Tr. 138:10-16, 139:15-17 (Nov. 12, 2020); the evidence that the charged cartridge casing was recovered at the location of the shooting, *see* Gov't Ex. 4-E; Test. of Jennifer McKeon, Trial Tr. 240:19-247:12 (Nov. 13, 2020); and the evidence that a cartridge jammed inside the recovered firearm was a Jagemann cartridge like the one recovered at the scene of the shooting, *see* Test. of Connie Duncan at 77:2-81:5, 86:1-88:24 (Nov. 12, 2020). The fact that "the government's case against [the defendant] was strong even without" the trocar testimony counsels against finding that the trocar testimony caused Shipp substantial prejudice, *Walker*, 974 F.3d at 204; *see Vinas*, 910 F.3d at 61.

The modest role that the trocar testimony played at trial also undercuts Shipp's arguments as to substantial prejudice. *Cf. Lee*, 834 F.3d at 160 (declining to grant a new trial based on a failure of Rule 16 disclosure after determining that the statement at issue was not "so critical" as the defendant suggested). Detective Bahm's testimony centered on his conclusion that the Jagemann cartridge recovered from the sidewalk on 147th Street, *see* Gov't Ex. 4-E, and a bullet fragment recovered at a nearby corner, *see* Gov't Ex. 4-A, were "consistent with" having been fired from the recovered Sig Sauer weapon, *see* Test. of Jeffrey Bahm, Trial Tr. 519:9-25, 521:5-13 (Nov. 17, 2020), while his analysis of additional fragments—including those recovered from Reginald Cooke's body—was inconclusive, *see id.* at 518:7-13. Shipp does not dispute that the government adequately disclosed these opinions in its expert notice. And while Shipp suggests that the several sentences of Detective Bahm's testimony that concerned trocars were critical to

the case because they forensically linked bullet fragments recovered from Cooke to the Sig Sauer charged in the indictment, context indicates otherwise. Detective Bahm invoked trocars to explain why certain bullet fragments did not bear markings that would enable him to assess whether or not those fragments were consistent with having being fired from the recovered Sig Sauer—not as a basis for concluding that the fragments in Cooke's body came from that weapon. *See id.* at 518:19-519:2. Indeed, Detective Bahm expressly stated that his microscopic analysis was "inconclusive" as to whether those fragments were consistent with having being fired from the recovered firearm, because these fragments did not have enough "individual characteristics . . . to make an identification one way or the other." *Id.* at 518:15-18. Viewed in the context of Detective Bahm's statement that his analysis did not link the fragments from Cooke's body to the recovered weapon, Detective Bahm's remarks on trocars simply were "not particularly damning evidence," *Lee*, 834 F.3d at 160. Consistent with that understanding, the government did not rely on the trocar testimony in either of its summations. *See* Gov't Opening, Trial Tr. 5:12-8:18 (Nov. 12, 2020); Gov't Summation, Trial Tr. 630:22-647:12 (Nov. 17, 2020). In sum, taking into account the limited nature of the trocar testimony and the strength of the government's other proof, any Rule16 violation in the government's failure to disclose the trocar testimony in its expert notice could hardly have "altered the dynamic of the trial." *Lee*, 834 F.3d at 160. Shipp has not established substantial prejudice from the asserted Rule 16 violation.

### 2. Shipp has not met the additional requirements for relief under plain-error review.

Shipp is likewise not entitled to a new trial under the plain-error rubric because he fails to meet the additional requirements of plain-error review. The plain-error requirement that "the error must have affected the defendant's substantial rights" ordinarily requires the defendant to "show a reasonable probability that, but for the error, the outcome of the proceedings would have

been different." *Rosales-Mireles v. United States*, 138 S. Ct. 1894, 1904-05 (2018). Shipp has not made that showing because, as explained above, the government's case rested on ample evidence other than the statements regarding trocars, which played a minor role in the government's case.

Similarly, Shipp has not demonstrated that the asserted Rule 16 error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Rosales-Mireles*, 138 S. Ct. at 1909. Whether an error meets that standard turns on "a case-specific and fact-intensive inquiry." *Ibid*. After considering the entire record, I cannot conclude that Shipp has demonstrated such a serious effect. Shipp's failure to object to the trocar testimony at trial deprived the Court of the opportunity to exercise its "broad discretion in fashioning an appropriate remedy" for any disclosure violations, *Walker*, 974 F.3d at 204—including remedies short of a new trial that are often favored, *see, e.g.*, *United States v. Douglas*, 336 F. App'x 11, 13-14 (2d Cir. 2009); *United States v. Tin Yat Chin*, 476 F.3d 144, 146 (2d Cir. 2007). Fairness counsels against granting a new trial based on a belated objection when I would likely have adopted a lesser remedy based on a timely and meritorious objection. *See United States v. Ledbetter*, 929 F.3d 338, 350 (6th Cir. 2019) (affirming denial of Rule 33 motion in part for this reason); *cf. Rosales-Mireles*, 138 S. Ct. at 1909 (relying on the fact that a sentencing error "can be remedied through a relatively inexpensive resentencing proceeding" in analysis of whether such errors "seriously affect the fairness, integrity, or public reputation of judicial proceedings"). Further, the fact that the defense "conduct[ed] a vigorous cross-examination" of Detective Bahm despite alleged discovery violations, *United States v. Felder*, 993 F.3d 57, 74 (2d Cir. 2021); *cf. United States v. Douglas*, No. 07-CR-068, 2007 WL 3124858, at *7 (N.D.N.Y. Oct. 24, 2007), *aff'd* 336 F. App'x 11 (2d Cir. 2009), and the very limited role that the trocar testimony played at trial, reinforce that a new trial is not required to protect the fairness, integrity, and public reputation of judicial proceedings.

**B.**     **Shipp is not entitled to a new trial on the grounds that Detective Bahm committed perjury.**

Shipp next argues that he is entitled to a new trial because Detective Bahm committed perjury during his testimony.  "To pursue relief from conviction based on claimed perjury," a defendant "must make a threshold showing that" a witness "in fact willfully testified falsely and that the falsehoods were not known to [the defendant] at the time of trial." *United States v. Aquart*, 912 F.3d 1, 20 (2d Cir. 2018).  If a defendant makes that showing, a court must then "assess the materiality of the false statements, applying one of two standards depending on the prosecution's awareness of the falsehoods at the time of trial." *Ibid.*  "If the prosecution knew, or should have known, of the false testimony prior to the conclusion of trial, the conviction must be set aside if there is 'any reasonable likelihood' that the testimony would have affected the jury's judgment." *Ibid.* (quoting *United States v. Cromitie*, 727 F.3d 194, 221-22 (2d Cir. 2013)).  "If the government was unaware of the falsity at the time of trial, a new trial is warranted if the court is left with the 'firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" *Ibid.* (quoting *United States v. Stewart*, 433 F.3d 273, 297 (2d Cir. 2006)).

**1.**     **Shipp has not shown that Detective Bahm committed perjury.**

The defendant has not made a threshold showing that Detective Bahm committed perjury.  "A witness commits perjury if he gives [i] false testimony [ii] concerning a material matter with [iii] the willful intent to provide false testimony." *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001).  But "[s]imple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." *Ibid.*  Nor does "incorrect testimony resulting from confusion, mistake, or faulty memory." *Ibid.*  "[A] mere disagreement" between experts also "does not reveal a falsehood." *United States v. Wade*, No. 09-CR-260S, 2011 WL 3800037, at *8 (W.D.N.Y. Aug. 26, 2011).

Shipp has not established that any errors in Detective Bahm's testimony were the product of willful intent to testify falsely, rather than simple inaccuracies or mere disagreements between experts. The four most developed allegations call for additional analysis. The defendant first contends that Detective Bahm committed perjury by testifying that "Jagemann ammunition has a very particular type of bullet that gets seated into the cartridge case" because its bullets "are made by a different manufacturer and then Jagemann buys those bullets from that bullet manufacturer and seats them in their cartridges." Test. of Jeffrey Bahman, Trial Tr. 516:11-25 (Nov. 17, 2020). The defendant argues that this testimony "was inaccurate" because Jagemann has informed the defense that Jagemann does not make ammunition, assemble ammunition, buy bullets, or seat bullets in its cartridge cases. *See* Def.'s Memo at 12; James Mann Decl. ¶¶ 3-6 (Dkt. #148-3). But while this evidence suggests that Detective Bahm's statement was inaccurate, Shipp has not shown that Detective Bahm did not believe it to be true at the time it was made. *See Wade*, 2011 WL 3800037, at *8. Indeed, in a declaration submitted with the government's opposition to Shipp's Rule 33 motion, Detective Bahm continues to adhere to the view that the ammunition he tested has a very particular type of bullet that gets seated in the cartridge case, but states that he now understands that the manufacturer of the bullets actually purchases the cartridge cases from Jagemann and then seats the bullets into those cases. *See* Jeffrey Bahm Decl. ¶ 9 (Dkt. #152-4).

The defendant next points to Detective Bahm's testimony that the Jagemann ammunition contained bullets that "fragment in flight." Test. of Jeffrey Bahm, Trial Tr. 516:23-25 (Nov. 17, 2020). The defendant argues that this statement was "inaccurate" because an independent ballistics examiner has informed the defense that even trocar bullets only "fragment on contact with an object." Def.'s Memo at 13; Liam Hendrikse Decl. ¶ 1 (Dkt. #148-4). But the defense has not demonstrated that Detective Bahm intended to communicate that the bullets at issue

fragmented before they hit an object.  Detective Bahm's declaration states that he used the term "in flight" to mean that the bullet fragments while it "is still traveling, even if it has already hit an initial object," not that the bullets fragmented "'in the air' before hitting a target."  Jeffrey Bahm Decl. ¶ 13.  Regardless, this inaccuracy does not amount to perjury because it does not concern a "material matter."  *Monteleone*, 257 F.3d at 219.  At most, the defense's theory at trial concerned whether the Jagemann ammunition contained bullets that fragmented.  Precisely when these bullets fragmented—before or after contact—was not material to any dispute.

Shipp also suggests that Detective Bahm committed perjury in response to questions on whether "full metal jacket cartridges . . . explode" when "they hit a soft object."  Test. of Jeffrey Bahm, Trial Tr. at 531:20-25 (Nov. 17, 2020).  Detective Bahm stated that he couldn't "say for sure" because "[b]ullets will fragment depending on different factors," and he "ha[d] seen full metal jackets that have fragmented."  *Id.* at 532:1-3.  When asked whether full metal jackets "typically do not explode," Detective Bahm said, "No, I wouldn't say that."  *Id.* at 532:4-6.  Shipp argues that these statements were perjurious because an independent ballistics examiner has informed the defense team that full metal jacket bullets "do not typically fragment or explode as trocars do when they hit soft surfaces such as tissue."  Def.'s Memo at 13; Liam Hendrikse Decl. ¶ 2.  But Detective Bahm responds that, in his view, his testimony was "entirely accurate." Jeffrey Bahm Decl. ¶ 20.  Detective Bahm states that in declining to agree with the proposition that full metal jacket bullets typically "do not explode," he was not "suggesting that full metal jacket bullets typically fragment upon hitting a soft object."  *Ibid.*  He states that in his view, "'explode' is not an accurate term to describe a bullet that fragments upon hitting an object."  *Ibid.* Moreover, he opines that "full metal jackets can fragment depending on a number of factors."

*Id.* ¶ 21.  Under these circumstances, Shipp has not established that Detective Bahm gave willfully false testimony regarding the frequency with which full metal jacket bullets fragment.

Shipp has likewise failed to show that Detective Bahm gave willfully false testimony when he stated that the FBI General Rifling Characteristics Database was "only for bullets."  Test. of Jeffrey Bahm, Trial Tr. at 558:9-16 (Nov. 17, 2020).  As Detective Bahm now acknowledges, that database also "contains some information about cartridge cases."  Jeffrey Bahm Decl. ¶ 25.  But Detective Bahm states in his sworn declaration that he "honestly believed that the database only contained information about bullets" at the time of his trial testimony.  *Id.* at 24.  Shipp has not put forward evidence that Detective Bahm's testimony did not genuinely reflect his understanding at the time that he testified.

> **2.      Shipp has also failed to show that any perjury entitles him to a new trial.**

Even if Detective Bahm committed perjury, the defendant has not shown that this testimony entitles the defendant to a new trial.  The defense argues that "the government should have known [Detective Bahm's] testimony was false" because the relevant testimony was "specifically elicited by the government on direct examination."  Def.'s Memo at 19.  But the mere fact that the government elicited the testimony at most suggests that the government had some awareness of the expected answer.  It does not show the government should have been aware that the answers were false or that this witness intended to give false testimony.

Because the defendant has not shown that the government knew or should have known that Detective Bahm's testimony was perjurious at the time of trial, he is entitled to a new trial only if "but for the perjured testimony, the defendant would most likely not have been convicted."  *Aquart*, 912 F.3d at 20.  Shipp cannot make that showing.  Where, as here, "independent evidence supports a defendant's conviction, the subsequent discovery that a witness's testimony at trial was perjured

will not warrant a new trial." *Stewart*, 433 F.3d at 300. As previously explained, the government presented compelling evidence beyond Detective Bahm's testimony that Shipp had possessed both the firearm and ammunition charged in the indictment. See pp. 10-14, *supra*. Had Detective Bahm testified differently, the verdict would likely have remained the same.

## CONCLUSION

The motion for a judgment of acquittal or for a new trial is denied.

SO ORDERED.

 /s/ Rachel Kovner
RACHEL P. KOVNER
United States District Judge

Dated:        May 11, 2021
              Brooklyn, New York